# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

CASE NO. 23-11417

———————————

LINDA BANKS,

*Plaintiff/Appellant,*

v.

MARKETSOURCE, INC.,

*Defendant/Appellee.*

———————————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE WILLIAM M. RAY, II
HONORABLE JUSTIN S. ANAND
(1:18-cv-2235)

———————————————————————————

## APPELLANT'S INITIAL BRIEF

———————————————————————————

Lisa C. Lambert
Law Office of Lisa C. Lambert
245 N. Highland Avenue
Suite 230-139
Atlanta, Georgia 30307
404-556-8759
lisa@civil-rights.attorney

Cheryl B. Legare
LEGARE, ATTWOOD & WOLFE, LLC
125 Clairemont Avenue
Suite 380
Decatur, Georgia 30030
470-823-4000
cblegare@law-llc.com

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellant/Plaintiff Linda Banks, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1. Honorable Justin S. Anand (Magistrate Judge)

2. Linda Banks (Plaintiff)

3. William E. Corum (Attorney for Defendant)

4. R. Anthony Costello (Attorney for Defendant)

5. Lisa C. Lambert (Attorney for Plaintiff)

6. Law Office of Lisa C. Lambert (Attorney for Plaintiff)

7. Cheryl B. Legare (Attorney for Plaintiff)

8. Legare, Attwood & Wolfe, LLC (Attorney for Plaintiff)

9. Marketsource, Inc. (Defendant)

10. Christopher Garrett Moorman (Attorney for Defendant)

11. Honorable William M. Ray, II (District Court Judge)

12. Abraham James Spung (Attorney for Defendant)

There are no publicly traded corporations involved in this case.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff/Appellant requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT……………………………….C-1

STATEMENT REGARDING ORAL ARGUMENT…………………………..C-2

TABLE OF CONTENTS…………………………………………………………...i

TABLE OF CITATIONS………………………………………………...……..…iii

STATEMENT OF JURISDICTION……………………………………….…..vii

STATEMENT OF THE ISSUES………………………………………………...1

STATEMENT OF THE CASE..………………………………………………...2

STANDARD OF REVIEW……………..……………………………………18

SUMMARY OF ARGUMENT……………………………...………………..20

ARGUMENT…………………………………………………...………………..22

I.  A JURY SHOULD DECIDED BANKS' FMLA CLAIMS ……………....22
    A. Banks Raised Jury Questions Regarding Both of Her FMLA Claims ….22
        1. Defendant Interfered With Banks' FMLA Rights ……………..........23
        2. Defendant Retaliated Against Banks For Exercising Her FMLA
           Rights …………...……………………………………….........25
            a. Defendant's Excuses For Terminating Banks are
               Pretextual……………………………………….…….....26
    B. All of Banks' Leave was Protected Under the FMLA ……………........29
    C. Theories of Liability Should Not Be Confused With a Plaintiff's
       Claim…………………………………………………………...30

II. BANKS SUFFERED TRIAL BY AMBUSH AND THE DISTRICT COURT
    ABUSED ITS DISCRETION IN DENYING HER MOTION FOR A NEW
    TRIAL……………..................................................................................33
    A. Standard For Granting a New Trial………………………………......34
    B. Trial By Ambush is *Supposed* to Be a Thing of the Past…………….........37

i

C. Defendant Ambushed Banks at Trial with Hearsay Testimony…………….................................................................................38

    1. Defendant's Hearsay Testimony Regarding Grulikowski Should Have Been Excluded………………………………….…........39

    2. Defendant Falsely Claimed that Lopez Complained About Banks' Performance………………………………………………........42

    3. Hearsay Testimony Permitted to Purportedly Show the Effect on the Listener Was in Error……………………………….……….......44

    4. Defendant Backdoored An Affirmative Defense It Never Asserted In Its Answer To Plaintiff's Complaint…………………………........46

    5. Defendant's Closing Argument Shows Its Intent to Use Hearsay Evidence For the Truth of the Matter Asserted………………........48

    6. Plaintiff Suffered Incurable Prejudice Due to the Hearsay Statements………………………………………………….......49

D. Defendant Should Not Have Been Permitted to Introduce Impermissible Character Evidence……………………………………………….........51

    1. Admission of Subsequent Hiring Decisions Was Error………......51

    2. Admission of Pomplon's Self-Serving Character Evidence Was Error…………………………………………………….......54

E. Defendant Violated the Pretrial Order Prohibiting Testimony that It Relied on Legal Advice in Terminating Banks………………………….......55

CONCLUSION……………………………………………………...55

CERTIFICATE OF COMPLIANCE…………………………………...56

CERTIFICATE OF SERVICE………………………………………………57

# TABLE OF CITATIONS

**U.S. Supreme Court cases:**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)……………………..…..………18

*Kotteakos v. United States,* 328 U.S. 750 (1946).……………..…………...….50

*Langnes v. Green*, 282 U.S. 531 (1931)……………………………….……….18

*McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995)………..….……46

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ………..…..27

*Swiekiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)…………....................33

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)………..….…..26

*The Styria* v. *Morgan*, 186 U.S. 1 (1902)………………………………...……18

*Williams v. Illinois*, 567 U.S. 50 (2012) ………………………………..….…..45

**Federal Circuit Court cases:**

*Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153 (11th Cir. 1986)………...…19, 50

*Anderson v. Cryovac, Inc.*, 805 F.2d 1 (1st Cir. 1986)……………………………37

*Ash v. Wallenmeyer*, 879 F.2d 272 (7th Cir. 1989)………………………..………38

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)……………………..19

*Brochu v. City of Riviera Beach*, 304 F.3d 1144 (11th Cir. 2002)…………..……19

*Brown v. Scriptpro, LLC*, 700 F.3d 1222 (10th Cir. 2012)………………....…24

*Cameron v. City of N.Y.*, 598 F.3d 50 (2d Cir. 2010)…………………………..48

*Commercial Credit Corp. v. Pepper*, 187 F.2d 71 (5th Cir. 1951)........................18

*Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982)………49

*Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379 (11th Cir. 2005)……………..….…29

*Damon v. Fleming Supermarkets of Florida, Inc.*,
  196 F.3d 1354 (11th Cir. 1999)…………………………………………..….28

*Erskine v. Consol. Rail Corp.*, 814 F.2d 266 (6th Cir. 1987)…………………36, 37

*Finley v. Marathon Oil Co.*, 75 F.3d 1225 (7th Cir. 1996)…………………..….41

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295 (11th Cir. 2016)……………….19

*Gamble v. Birmingham S. R. Co.*, 514 F.2d 678 (5th Cir. 1975)……………..……52

*Gonzales v. Police Dept., City of San Jose, Cal.,* 901 F.2d 758 (9th Cir. 1990)….52

*Greyhound Lines, Inc. v. Miller*, 402 F.2d 134 (8th Cir. 1968)………….……36, 37

*Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir.1994) ……………………....……27

*Hulsey v. Pride Rests., LLC*, 367 F.3d 1238 (11th Cir. 2004) ……………………31

*Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974)............…53

*Jones v. Aaron's Inc.*, 748 F. App'x 907 (11th Cir. 2018)…………………….…24

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)……………………..18

*Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir. 2013)……...18

*Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768 (11th Cir. 2008)………...41

*Martin v. Brevard Cty. Public Schools*,
  543 F.3d 1261 (11th Cir. 2008)……………………………...23, 24, 25, 26

*Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*,
  984 F.2d 1118 (11th Cir. 1993)…………………………………………47

*Plumbers & Steamfitters Loc. No. 150 Pension Fund v. Vertex Constr. Co.*,

932 F.2d 1443 (11th Cir. 1991)……………….…………….…..………..30

*Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978)………..…....…35, 36, 37

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998). …………….…..…..………28

*Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980)…………….……..37

*Strickland v. Water Works and Sewer Bd. Of the City of Birmingham*,
239 F.3d 1199 (11th Cir. 2001)……………….................................………23

*T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*,
931 F.2d 816 (11th Cir. 1991)………..……………………………....….44

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005)…………….……….19

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999)………..…………19, 49

*United States v. Sawyer*, 799 F.2d 1494 (11th Cir.1986)…………………..…….. 53

*United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982)……………………...…….53

*Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015)………………………..18

*Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312 (11th Cir. 2011)……..….19

*Woods v. START Treatment & Recovery Centers, Inc.*,
864 F.3d 158 (2d Cir. 2017) ………………………………………….25

**Federal District Court cases:**

*Corbitt v. Walgreen Co.*, No. 7:14-CV-17 (MTT),
2015 U.S. Dist. LEXIS 49186 (M.D. Ga. Apr. 15, 2015)……………..…….32

*Giardina v. Lockheed Martin, Corp.*, 2003 WL 21634934 (E.D. La. 2003)…....…28

*Henley v. FMC Corp.*, 189 F.R.D. 340 (S.D. W. Va. 1999)……………..……..35

*Mason v. George*, No. 1:12-CV-159 (WLS),
2013 U.S. Dist. LEXIS 148471 (M.D. Ga. Oct. 16, 2013)……………...….38

**Statutes:**

28 U.S.C. §1291……………………………………………….…………vii

29 U.S.C. § 2612.……………………………...…………………...………..22

29 U.S.C. § 2615.……………………………...…………...………..……24

29 U.S.C. § 2914.……………………………...…………………...…………..……24

**Codes:**

29 C.F.R. § 825.220……………………………...….…………………..……………..29

29 C.F.R. 825.300……………………………...….……………………………..……30

**Rules:**

Fed. R. Civ. P. 26.……………………………...….……………..……………..……40

Fed. R. Civ. P. 37.……………………………...….……………..……………..……41

Fed. R. Civ. P. 59.……………………………...….……………..…..……………34, 54

Fed. R. Evid. 403 ……………………………...….…………………..……………..53

Fed. R. Evid. 404 ……………………………...….…………………..……………51, 54

Fed. R. Evid. 803 ……………………………...….……………..…..……………...44

**Other:**

Charles A. Wright *et al.*, <u>Federal Practice and Procedure</u> § 2803 (2d ed. 1995)…35

## **STATEMENT OF JURISDICTION**

This case is an appeal of a final judgment from the United States District Court for the Northern District of Georgia. Jurisdiction lies under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

I.    Whether Plaintiff put forth sufficient evidence for a jury to decide her claims of FMLA interference and retaliation.

II.    Whether the District Court erroneously conflated Plaintiff's FMLA claims of interference and retaliation with theories of liability, thereby holding her to higher pleading standard and wrongfully granting summary judgment as to each claim.

III.    Whether the lower court abused its discretion in denying Plaintiff a new trial where she was subjected to a "trial by ambush" by the admission of hearsay, allegations, and defenses never disclosed by the Defendant before trial, where the cumulative effect of the court's erroneous rulings substantially prejudiced Plaintiff.

## STATEMENT OF THE CASE

Plaintiff/Appellant Linda Banks is a black woman who suffers from chronic hypoglycemia, which is exacerbated by stress and anxiety. She worked for Defendant/Appellee MarketSource as a Project Manager (PM) from August 2010 until her illegal termination in July 2016.

### Working For Defendant

Banks has over a decade of experience working as a PM, holds numerous PM Certifications, and is proficient in all related software. (Doc. 175 at 101:7-103:23; Doc. 155-31 at 35-37).[1] As a PM, Banks was responsible for leading a project team and the "initiation, planning, executing, monitoring and controlling, and closing out the project activities within scope, …budget, and on time." (Doc. 175 at 103:15-20).

Banks started working for MarketSource as a PM on August 23, 2010 through a recommendation from her then-supervisors. (Doc. 175 at 104:10-106:16). The position paid an annual salary plus bonuses based on performance. (*Id*. at 107:19-25). Prior to Banks' firing, she always received the merit-based bonuses and favorable performance reviews. (*Id*. at 108:1-113:14; (Doc. 166 at 22:8-16;[2] Docs. 155-17—155-20).

---

[1] Pursuant to 11th Cir. R. 28-5, all transcript cites are to the document and page number as assigned in the court's electronic filing system—not the individual page numbers assigned by the court reporter(s).

[2] All citations to Doc. 166 are to MarketSource's Rule 30(b)(6) testimony.

In 2015, Banks' supervisor recommended her for a position with the senior executive leadership team in its Project Management Office (PMO) and she transferred to the PMO in February 2015. (Doc. 175 at 113:15-117:24; Doc. 155-13; *Id*. at 113:15-19, 118:1-14; Doc. 155-31 at 35-37). This PM position was no different than work she did in the past except that the projects were internal, not for MarketSource's clients. (Doc. 175 at 118:24-119:19). Again, she received all performance bonuses until her termination. (*Id*. at 108:1-3, 119:21-25).

Banks worked with three other PMs in the PMO—they are all white. (Doc. 175 at 120:11-22). They all had the same job duties. (*Id*. at 120:23-24). The PMs did not have individual offices, instead they worked in cubicles right outside their supervisor's office. (*Id*. at 120:3-10).

Banks worked under two managers—Sam Tasanasanta and then Bill Weaver—and had good relationships with each one, receiving positive feedback and reviews. (Doc. 175 at 122:25-124:25; Doc. 155-21). The initial projects assigned to her all closed on time and within budget; she was not criticized for her work on any of these projects. (Doc. 175 at 122:15-24). In fact, she received a $5,250 bonus on February 13, 2016. (*Id*. at 125:1-126:6; Doc. 155-31 at 30).

### **Working Under Pomplon**

In March 2016, Paul Pomplon became the supervisor of the PMO. (Doc. 175 at 133:13-15). In contrast to the relationships she had with her prior supervisors,

Banks relationship with Pomplon was strained because he "treated [her] disrespectfully because of [her] race." (*Id*. at 133:16-23). He treated Banks differently than her white coworkers—speaking to them nicely but to her in demeaning, angry tones. (*Id*. at 133:22-134:1). He repeatedly turned his back to her while speaking to her white coworkers. (*Id*. at 134:4-9; 134:7-138:7; Doc. 176 at 8:6-10). During group meetings, he would engage with Banks' white coworkers but refuse to even look at her. (Doc. 175 at 139:10-13). He also prohibited Banks from working independently and scrutinized all of her work, berating her in the process, not treating her white coworkers this way. (*Id*. at 138:20-139:1).

At a one-on-one meeting in his office in early April 2016, Banks stood up to leave and asked if he wanted his office door left open or closed; Pomplon told her to leave it open "because now it smells foul in here." (Doc. 175 at 143:16-144:5). Banks was humiliated by Pomplon's statement because claiming black people smell is a racist stereotype. (*Id*. at 144:3-17).

During another open-door one-on-one meeting, Pomplon badgered and berated Banks, yelling at her while standing over her waiving his hands; Bank's white co-worker was sitting at her desk and heard everything. (Doc. 175 at 144:20-145:4). Banks was embarrassed; he did not yell at her white coworkers. (*Id*. at 145:3-7).

### SBI Project

In early April, Banks received an overview of the Sales Benchmark Index (SBI) project that began in January 2016 and was behind schedule. (Doc. 175 at 146:1-147:3, 151:4-5). SBI was a vendor hired by MarketSource to provide marketing services. (*Id*. at 147:6-15). The marketing department had issues not only with the delay but transparency and details of the project. (*Id*. at 160:13-16, 161:13-17). By the middle of the month, Banks started meeting with the SBI project manager, his boss, and MarketSource's director of marketing. (*Id*. at 147:16-148:6). Banks was assigned to work on the SBI project because it was 50% behind schedule; she was directed to advise SBI so that it could come back on track. (*Id*. at 148:7-23, 151:18-20, 160:23-24, 161:21-24). This later morphed into Banks co-managing the project with SBI and she even started running separate meetings with the marketing team to ensure it stayed on track and met their needs. (*Id*. at 148:24-149:1, 234:2-23).

Then, on May 4, 2016, during a company happy hour, a gnat flew into Banks' drink and Pomplon asked why she wasn't drinking it asking, "you don't like gnats?" (Doc. 175 at 171:10-22). He said, "do you have any rats, roaches or mice in your house?" She said no and all of her co-workers started laughing at her. (*Id*. at 171:23-172:1). Banks was again humiliated because this was another racist stereotype, that black people live in the ghetto in dirty homes with rats, roaches, and mice running

around. (*Id*. at 172:10-15). All the while Pomplon was talking to her in a condescending tone and made comments about people getting fired for incompetence. (*Id*. at 172:2-22).

The very next day, the SBI project was in the "green" meaning it was on track—only two weeks prior it was in "red" status. (Doc. 175 at 223:3-17; Doc. 155-28). Banks was instrumental in turning the project around. (Doc. 175 at 223:18-23).

The following week, on May 12, 2016, Pomplon continued to fly speck Banks' work and returned a document to her that he claimed had formatting and font issues; neither having anything to do with her ability to do her job. (Doc. 175 at 174:17-177:3; Doc. 155-15). The next day he criticized her reports for not having numbered notes and claimed the notes were too verbose; she had not had such criticism in the past, and again, it had nothing to do with her ability to perform her job. (Doc. 175 at 177:13-179:23; Doc. 155-16). Pomplon was pleased with her edits; however, his continued nitpicking impeded her ability to do her job. (Doc. 175 at 180:18-181:8). No one from marketing or SBI criticized Banks' work on the project—only Pomplon. (*Id*. at 181:10-18).

### Plaintiff's Complaints About Pomplon

Banks believed that Pomplon's degrading, differential treatment of her was because of her race. (Doc. 175 at 133:21-134:1). On May 13, 2016, when Banks could no longer stand Pomplon's treatment of her, she reached out to Human

Resource agent Ingrid Ervin-Harris to request a confidential meeting. (*Id*. at 181:19-182:25; Doc. 155-2).

Ervin-Harris scheduled the meeting for May 17, 2016, and immediately alerted Pomplon of Banks' request. (Doc. 168 at 30:6-31:21; Doc. 175 at 184:2-5). The day before the meeting, Ervin-Harris told Pomplon she would call him after the meeting with Banks to discuss it with him. (Doc. 168 at 32:19-33:15).

Just prior to the meeting, Banks emailed Ervin-Harris a detailed description of some of the issues she was having with Pomplon, describing his conduct as "psychological harassment" interfering with her ability to perform her job and that his behavior was "very unwelcoming" to her – she wanted it to end. (Doc. 175 at 184:3-185:9; Doc. 155-3). Ervin-Harris admits that if someone uses the word "harassment" that is a "buzz word" for HR. (Doc. 168 at 23:6-19).

At the meeting, Ervin-Harris was condescending to Banks and ignored most of the issues raised in Banks' email *except* for Pomplon's rat and roaches comment. (Doc. 175 at 185:10-14; Doc. 177 at 244:23-25). Banks told Ervin-Harris Pomplon was aggressive towards her and did not treat her (white) co-workers in the same manner. (Doc. 175 at 185:14-16). At the end of the meeting, Ervin-Harris said she would address the "rats and roaches" comment with Pomplon—but did not say why, let alone say whether she would investigate all her complaints. (*Id*. at 185:20-186:5). Ervin-Harris never formally interviewed Banks, asked her to make a signed

statement, or told Banks she completed an investigation. (Doc. 177 at 245:13-246:9).

None of Banks' white coworkers complained about Pomplon's treatment of them. (Doc. 166 at 25:6-8).

**<u>Performance Improvement Plan</u>**

When Banks returned to her desk from meeting with Ervin-Harris, she had a new email invite from Pomplon to meet with him that day at 3:30 p.m. with the subject line, "catch up;" Pomplon scheduled it that morning (Doc. 175 at 186:18-187:15).

When Banks went to his office, Pomplon slid a Performance Improvement Plan (PIP) across his desk and told her "you know what this is" and told her to read it, sign it, and give it back to him. (Doc. 175 at 187:16-25). The PIP was not dated, it simply noted "May, ??, 2016" and stated she would have five weeks, until June 24, 2016, to complete it. (*Id*. at 189:16-18; Doc. 155-7). Banks went back to her desk, read it, signed it, made copies, and returned it to Pomplon. (Doc. 175 at 188:23-25).

Pomplon was the sole decisionmaker in placing Banks on a PIP. (Doc. 166 at 25:15-24; Doc. 167 at 57:5-8). Pomplon at no point explained the PIP to Banks and did not explain what the next steps would be. (Doc. 175 at 189:1-11). Prior to that day, there were no discussions that Banks' performance warranted a PIP. (*Id*. at 189:12-15). The PIP did not advise Banks that she had the ability to write a rebuttal.

(*Id*. at 191:3-10). This was the first PIP Banks received during her entire employment history. (Doc. 166 at 26:19-22; Doc. 175 at 189:24-190:1). In fact, she never even received a write up before. (Doc, 166 at 24:7-9; Doc. 175 at 190:2-13).

As she read the document, Banks noticed that Pomplon's comments were exaggerated and misleading. (Doc. 175 at 191:17-20). She did not have trouble timely completing documents and Pomplon completely left out that the delay on the status minutes was caused by SBI failing to provide information and Pomplon himself delaying the process. (*Id*. at 197:4-198:6, 199:20-200:13). He never accused her of delaying the document at the time she produced it to the group. (*Id*. at 198:7-8, 205:8-13). As for accusing her of sending out documents without his review, this was simply not true; he approved the report with questions as to 2 items that SBI wanted on the agenda. (*Id*. at 206:11-208:4, 210:1-10). Next, Banks was proficient in Microsoft Project and the critique was baseless. (*Id*. at 212:20-213:4, 215:13-15). And Banks did take charge of meetings after being assigned that role—she interacted with the team, asking questions, and obtaining updates—she was actively involved. (*Id*. at 217:19-218:5).

After getting the PIP, Banks was required to attend weekly meetings with Pomplon and his supervisor, Chris Walter. (Doc. 175 at 223:24-224:25). During the meetings they discussed the status of the project—but they did not discuss the PIP. (*Id*. at 225:4-14; Doc. 176 at 8:11-18). Pomplon remained aggressive and

condescending towards Banks during the meetings and falsely claimed she was not doing required tasks in front of Walter. (Doc. 175 at 225:15-226:3). Walter did not really participate in the meetings; he was simply present. (*Id*. at 227:10-12). After putting her on the PIP, Pomplon did not provide Banks with any resources to improve her alleged poor performance. (*Id*. at 226:11-14).

Within a week of giving her the PIP, Pomplon twice falsely accused Banks of failing to document issues on the SBI project; he only admitted his error once and failed to apologize. (Doc. 175 at 230:6-233:4; Doc. 155-31 at 16-19). Meanwhile, despite all of the pressure, Banks continued to keep the SBI project in the "green." (Doc. 175 at 227:14 -228:25; Doc. 155-12).

### Plaintiff's Medical Condition and Protected Leave

On Wednesday, June 1, 2016, in a meeting with Pomplon and Walter, Banks disclosed her hypoglycemia, explained that she had been having issues with her chronic condition flaring up, and that each time this happened she needed at least a thirty-minute break to recover her blood sugar levels. (Doc. 33-35, ¶ 10). When Banks suffers from a hypoglycemic episode, it impairs her vision and she becomes shaky, gets a headache, and develops nausea and vomiting. (Doc. 34 at 164:12-20; Doc. 32-2, ¶ 4).

The next day, Walter told Banks to discuss her medical issue and need for time off work with HR; she emailed Ervin-Harris that same day and Ervin-Harris,

once again, alerted Pomplon that Banks wanted a private meeting. (Doc. 33-35, ¶ 11; Doc. 33-9; Doc. 34 at 80:16-24, 82:21-22; Doc. 34-6). At the meeting, Ervin-Harris' response to Banks' disclosure was that Banks did not look "disoriented or that she was walking into walls or anything." (Doc. 34 at 83:21-24, 165:6-24; Doc. 33-35). Ervin-Harris told Banks she needed a doctor's excuse for her medical condition and that it better be clear and concise with specific details. (Doc. 33-35, ¶ 12). She then quipped that the PIP still stands and Banks better "dot her i's and cross her t's" going forward. (Doc. 34 at 83:16-20; 83:24-84:2; Doc. 32-2, ¶ 31).

That same day, June 2, 2016, Pomplon demanded that Banks redo SBI meeting minutes without any guidance as to what was incorrect. (Doc. 175 at 239:13-242:25). After revising the document, which Banks did on her own, Pomplon stated it was a "100%" improvement. (*Id*. at 242:1-243:5). However, Pomplon accused her of using her medical condition as an excuse or seeking outside help— and in fact asked her coworkers if they helped her (they did not). (Doc. 155-31 at 20; Doc. 167 at 29:3-24).

On Friday, June 3, 2016, Banks saw her physician and, that afternoon, provided the medical documentation to Ervin-Harris. (Doc. 32-2 at ¶ 30; Doc. 33-11). On Monday, June 6, 2016, Ervin-Harris emailed Banks, copying Pomplon and Walter, stating her request for an "accommodation" of 30-minute breaks was approved. (Doc. 33-10). Ervin-Harris did not advise Banks of her rights under the

FMLA. (Doc. 32-2 at ¶ 31). Pomplon asked Ervin-Harris whether he should monitor how much time off work Banks took due to her medical condition to "help judge how serious of a problem this is." (Doc. 33-13). A couple of times, he refused to allow Banks to take medically required breaks. (Doc. 34 at 92:6-13; Doc. 32-2 at ¶ 32). That same day, Pomplon reprimanded Banks for including a topic on the next SBI meeting agenda that he and Walter told her to include previously. (Doc. 32-35).The day *after* Banks was approved to take intermittent breaks from work, Walter admittedly began soliciting alleged performance issues regarding Banks from two years earlier. (Doc. 33-36; Doc. 38 at 77:11-17).

Neither Walter nor Ervin-Harris had personal knowledge of Banks' performance; Pomplon was their only source for any alleged deficiencies in her work. (Doc. 35 at 65:25-66:3; Doc. 38 at 36:6-11). However, at trial, both changed their testimony, claiming that others complained about Banks' performance. Ervin-Harris claimed that Banks' prior supervisor told her that Banks made "a lot of mistakes." (Doc. 167 at 98:21-99:3, 100:1-3; Doc. 168 at 26:3-16). And Walter claimed a vice president—whose name was never disclosed or referenced during discovery or at any point until trial—had issues with her performance. (Doc. 167 at 63:16-23, 71:25-3). Even Pomplon made allegations of additional people having complaints of Banks' performance at trial that were never alleged prior to his trial testimony. (Doc. 168 at 82:14-83:12, 84:10-85:13).

## Continuous Medical Leave

One week later, on June 13, 2016, Banks called in sick due to the *continued* hypoglycemic episodes; she went to see her doctor who recommended she have leave from work for a minimum of two weeks due to hypoglycemic episodes, anxiety, and depressed mood. (Doc. 34 at 99:10-21, 100:6-12; Doc. 32-2 at ¶¶ 33-34, Att. 3; Doc. 175 at 256:18-24). She took continuous FMLA approved leave from that day through July 22, 2016. (Doc. 34 at 102:7-16; Doc. 32-2 at ¶ 37, Att. 4; Doc. 175 at 257:2-9).

Her physician certified that the dates of her treatment occurred on June 3, 2016, June 13, 2016, and July 7, 2016, and that she was unable to perform her job duties at that time because of her then-mood, including anxiety and sadness affecting her ability to concentrate on job-related tasks as well as her hypoglycemia affecting her vision and causing shakiness and rendering her incapacitated. (Doc. 32-2 at ¶¶ 38-39, Att. 4). Allegis Benefits approved Banks's FMLA protected leave stating that **"all leave taken for this reason will be designated as FMLA leave."** (Doc. 32-2, ¶ 40, Att. 5) (emphasis added).

Throughout her leave, Ervin-Harris, either directly or through her assistant, harassed Banks for medical documentation and forms, even threatening to fire her if she did not immediately comply—even though the leave at that point was facilitated

by Allegis Benefits, not her. (Doc. 34 at 124:8-23, 125:1-8, 126:19-127:9, 127:20-24, 128:2-25, 130:9-131:3, 143:4-8).

**<u>Termination</u>**

According to MarketSource, Pomplon was the sole decisionmaker for Banks's firing; Ervin-Harris played a "consultative role" but was not a decisionmaker. (Doc. 166 at 30:14-31:25). At trial, Defendant claimed Pomplon decided to fire Banks before June 9, 2016; at summary judgment, it specifically stated the decision was made on June 8, 2016. (Doc. 29-2, ¶ 46; Doc. 168 at 155:13-16). MarketSource cannot answer whether anyone reviewed Banks' work product to verify Pomplon's allegations that it was deficient and warranted his decision to fire Banks. (Doc. 166 at 30:19-31:25, 36:6-38:3). Walter did not independently evaluate her performance and solely relied on Pomplon's feedback regarding the same. (Doc. 167 at 51:12-25).

On June 9, 2016, Pomplon provided Banks with the *first* documented feedback on her PIP performance via email. (Doc. 175 at 235:4-17; Doc. 155-8). But the PIP update shows mainly improvement regarding his alleged criticisms; the only major issue was the June 2nd report that she rewrote (while ill) and the final product was good. (Doc. 175 at 236:5-25, 239:10-242:20, 243:14-23). As for other alleged deficiencies on the update, they were false or misleading. (*Id*. at 244:9-246:6, 251:4-254:11, 254:22-255:9). At this point in time, Banks was only about halfway through

her PIP and Pomplon gave no indication that he was going to fire her. (*Id*. at 255:21-256:1).

On July 26, 2016, three days after Banks returned from FMLA leave, Pomplon and Ervin-Harris met with Banks and fired her stating it was because she failed to complete the PIP. (Doc. 166 at 33:13-15; Doc. 175 at 257:10-258:1). But Banks was not provided the full five weeks to complete the PIP. (Doc. 166 at 30:9-18; Doc. 175 at 258:2-6). Then they escorted her to her car to get her laptop, humiliating Banks to the point she did not even return to her desk to collect personal items. (Doc. 175 at 258:18-259:5).

Defendant failed to pay Banks her wages for her last three days of work or her bonus, which she earned the prior year. (Doc. 166 at 39:2-18; Doc. 176 at 12:3-15; Doc. 155-22 at 7). Banks' white coworker, Rob D'Elena, was terminated for alleged performance deficiencies like Banks' and received a severance payment of $64,350.00. (Doc. 166 at 42:16-44:17; Doc. 167 at 64:13-65:7). Ervin-Harris was fired two days after Banks for misconduct; she received a severance payment. (Doc. 36 at 120:19-122:12; Doc. 33-18).

**EEOC**

Banks filed her Charge on July 26, 2016. (Doc. 175 at 260:15-17). Defendant filed its position statement to the Charge on October 6, 2016. (Doc. 166 at 39:20-40:14).

## Course of Proceedings Below

Banks filed her Complaint on May 17, 2018 alleging race discrimination and retaliation in violation of Title VII and Section 1981, and FMLA interference and retaliation claims. (Doc. 1). At the close of discovery, Defendant moved for summary judgment in full and Banks opposed the motion. (Docs. 29, 32, 46-50). The magistrate judge issued a Report and Recommendation (R&R) on the motion, recommending denying summary judgment as to the race discrimination claim, but otherwise granting the motion. (Doc. 51). The Parties filed objections and on March 20, 2020, the District Court adopted the R&R. (Docs. 55, 56, 60).

The Parties filed the proposed pretrial order on May 20, 2020. (Doc. 67). The District Court held the pretrial conference on July 8, 2020. (Docs. 71-73, 93). The Court granted Banks' motion *in limine* to preclude Defendant's witnesses from saying they relied on legal advice in terminating her employment. (Docs. 76, 87). The trial date was continued due to the COVID-19 pandemic. (Doc. 85). The following year, the Parties submitted consent to a magistrate judge for trial to have a date-certain for the proceedings. (Docs. 100, 101). On August 20, 2021, the Parties selected a jury; however trial ended in mistrial due to COVID-19-related issues. (Docs. 125, 127-129).

The trial was rescheduled to Monday, February 14, 2022. (Docs. 141, 145). The trial lasted five days and ended with a defense verdict on February 18, 2022.

(Docs. 147-152). The court entered judgment on February 24, 2022, and an amended judgment on March 10, 2022. (Docs. 153, 154). Banks timely filed her Motion for a New Trial on March 24, 2022. (Doc. 160). She supplemented her motion once the transcripts were prepared, Defendant filed its opposition to the motion, and Banks filed her reply. (Docs. 172, 173, 179, 181). The court held oral argument on October 28, 2022. (Docs. 183, 206). The court denied the motion on March 30, 2023, and Banks timely filed her Notice of Appeal to this Court on April 26, 2023. (Docs. 185, 191).

## STANDARD OF REVIEW

The standard of review of an entry of summary judgment is *de novo*. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004). At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). This includes inferences that are "not necessarily the most plausible." *Valderrama v. Rousseau*, 780 F.3d 1108, 1120 n.14 (11th Cir. 2015).

The standard of review for denial of a motion for a new trial is abuse of discretion. *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013). "The term 'discretion' denotes the absence of a hard and fast rule." *Langnes v. Green*, 282 U.S. 531, 541 (1931), quoting, *The Styria* v. *Morgan*, 186 U.S. 1, 9 (1902). "When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." *Id*. "[A]n appellee court is not bound to stay its hand and place its stamp of approval on a case when it feels that injustice may result. Quite to the contrary, it is definitely recognized in numerous decisions that an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error." *Commercial Credit*

*Corp. v. Pepper*, 187 F.2d 71, 75-76 (5th Cir. 1951).[3]

A trial court's evidentiary rulings are reviewed for abuse of discretion. *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1316 (11th Cir. 2011). Evidentiary rulings based on "an erroneous view of the law is considered an abuse of discretion." *Id*. "An error is harmless unless it affects the substantial rights of the parties." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). Substantial rights are affected "if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error." *Id.*, quoting, *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1159-60 (11th Cir. 1986). While evidentiary rulings over objections are reviewed for an abuse of discretion, if a party fails to object to a ruling at trial, the standard of review is plain error. *United States v. Hands*, 184 F.3d 1322, 1334-35 (11th Cir. 1999). "However, the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). Where "substantial prejudice" is shown, denial of a motion for new trial should be reversed. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted all decisions of the former Fifth Circuit issued prior to October 1, 1981.

## SUMMARY OF ARGUMENT

Linda Banks is a black woman who worked for Defendant for years without incident, earning good performance reviews and merit-based bonuses. This all changed when she got a new supervisor who within weeks of coming on board treated her with contempt and condescension and made racially stereotypical comments towards her. He did not do these things to her three white co-workers. He ratcheted up the targeting by putting her on a baseless PIP. This maltreatment caused Banks to suffer from hypoglycemic episodes that initially required intermittent leave and escalated to continuous leave. This leave was approved for FMLA protections. Only after learning of her serious medical condition, her supervisor decided to fire Banks—before she could even complete the PIP. The trial court erroneously granted summary judgment on Banks' two FMLA *claims* by conflating the claims (interference and retaliation) with theories of liability, which plaintiffs are not required to plead. The trial court further erred in claiming that Banks' disclosure of additional facts underlying her claims—facts uncovered through discovery and known to both parties—was too late to provide notice to the Defendant of her *claims*. This is error and a jury should decide her FMLA claims.

In contrast to the standard Plaintiff was held to at summary judgment, at trial, the lower court permitted the Defendant to put forth new allegations and defenses never disclosed to Plaintiff prior to trial. Going into trial, the main dispute regarding

Banks' termination was that her supervisor, and him alone, thought she suffered from performance deficiencies; Banks disputed his claims as false or overblown. Defendant was able to put into evidence through hearsay testimony that several individuals complained about Banks' performance and use the hearsay as substantive evidence in closing arguments. But these allegations were never disclosed prior to trial. Defendant was also permitted to put in irrelevant character evidence of the hiring of a black man over nine months after Banks' firing. When Plaintiff objected, the lower court noted she had been on notice of this defense since opening statements. Further, despite a long-standing pretrial order prohibiting testimony of seeking legal advice in firing Banks, her supervisor said in-house counsel was consulted in front of the jury. Defendant subjected Banks to a "trial by ambush" and this ambush substantially prejudiced Banks at trial. The lower court abused its discretion in failing to order a new trial, but justice requires a new one.

## ARGUMENT

### I.     A JURY SHOULD DECIDED BANKS' FMLA CLAIMS

The Family Medical Leave Act (FMLA) permits an employee to take twelve weeks of annual leave for a serious medical condition. *See* 29 U.S.C. § 2612(a)(1)(D). The Act prohibits employers from interfering with an employee's rights or retaliating against an employee for exercising their rights. Banks filed both *claims*—interference and retaliation—and demonstrated at summary judgment that a jury question existed as to both claims. The court below erroneously dismissed Banks' FMLA claims by failing to consider the entirety of her protected leave and conflating a *claim* and a theory of liability. The court's Order should be reversed and a jury should determine Banks' FMLA claims.

#### A. Banks Raised Jury Questions Regarding Both of Her FMLA *Claims*

Here, the facts underlying Banks' interference and retaliation claims are the same. Banks' protected activity began when she sought intermittent leave under the FMLA for her chronic hypoglycemia. On June 1, 2016, she notified Pomplon and Walter of her ailment after suffering hypoglycemic episodes triggered by the stress and anxiety she was suffering due to Pomplon's discriminatory treatment of her. The next day, she informed Ervin-Harris. Ervin-Harris directed  Banks to obtain a note from her doctor detailing the need for intermittent leave of thirty-minute breaks whenever she suffered a hypoglycemic episode, which she provided to Defendant

on Friday, June 3, 2016. Her breaks were "approved" by Ervin-Harris on Monday, June 6, 2016, via email copying Pomplon and Walter; however, Ervin-Harris did not apprise Banks of her FMLA rights. Pomplon immediately asked if he should track the frequency of Banks' breaks and then subsequently refused to honor the medically required time off work a couple of times. Only *five days after receiving her doctor's note*, on June 8, 2016, Pomplon decided to terminate Banks. At that point, she was only halfway through the PIP.

Banks then took continuous FMLA-approved leave from June 13, 2016 through July 22, 2016. The FMLA approval stated all leave taken for the reasons outlined by Banks' doctor "will be designated as FMLA leave." This included her hypoglycemic episodes that she first reported on June 1, 2016 to Pomplon and Walter. Defendant fired Banks three days after she returned from continuous leave—with two weeks remaining on the PIP and without extending the PIP to cover the time out on leave—and failed to pay her for her last days of work or her bonus earned the prior year.

### 1. *Defendant Interfered With Banks' FMLA Rights*

"To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard Cty. Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008). An interference claim constitutes *any* interference with the Plaintiff's rights under the Act. *Strickland v.*

*Water Works and Sewer Bd. Of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). This includes restraining or denying the "exercise of or the attempts to exercise, any right provided" by the Act. 29 U.S.C. § 2615 (a)(1). And an employee has the right "to be restored by the employer to the position of employment held by the employee when the leave commenced" and retain all benefits of her employment, including pay. 29 U.S.C. § 2914(a)(1) and (2). For interference claims, the employer's "*motives are irrelevant*," and pretext need not be established. *Martin,* 543 F.3d at 1267 (emphasis added); *see, e.g.*, *Brown v. Scriptpro, LLC*, 700 F.3d 1222, 1226-27 (10th Cir. 2012) (the *McDonnell Douglas* framework is not applied to interference claims). Taking the facts in Banks' favor, a reasonable jury could find that Defendant interfered with her rights under the Act by failing to inform her of her rights, denying her breaks, terminating her, and failing to pay her last wages and bonus.

As to the interference claim, Defendant is afforded the opportunity to prove it would have terminated the Plaintiff regardless of her FMLA leave. *Martin*, 543 F.3d at 1267. Here Defendant cannot meet its burden "beyond dispute." *Jones v. Aaron's Inc.*, 748 F. App'x 907, 919 (11th Cir. 2018) (reversing district court, finding defendant failed to meet the burden of its affirmative defense). Pomplon only made the decision *after* he learned of Banks's chronic medical condition and need for intermittent leave. In fact, he claims he made this decision only 7 days after learning

of her medical condition and 2 days after Defendant approved her medically necessary breaks. There is no proof, beyond a doubt, that the termination decision was unrelated to Banks' condition. A jury should decide whether Defendant interfered with Banks' FMLA rights.

### 2. *Defendant Retaliated Against Banks For Exercising Her FMLA Rights*

Plaintiff can easily satisfy her *prima facie* case of retaliation: (1) she engaged in statutorily protected expression by notifying Defendant of her serious medical condition and need for protected leave on June 1, 2016 (and June 2nd and 3rd), as well as on June 13, 2016; (2) Defendant decided to terminate her employment, terminated her employment, failed to pay her bonus and final wages; and (3) the adverse acts were causally related to the protected expression. *Martin*, 543 F.3d at 1268 (11th Cir. 2008). Unlike interference claims, retaliation claims do look at the intent of the employer. *See id*. at 1267. But to this end, Banks' only burden is to show that her FMLA activity was a "motivating factor" for the adverse acts, not the sole reason. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2d Cir. 2017). Pomplon's retaliatory animus is shown by his reaction to her medical condition, monitoring every break, and even refusing her breaks. Defendant's antagonism towards her leave is also shown through Ervin-Harris's snide comment to Banks that she did not look like she was "walking into walls" on June 2, 2016, and repeated harassment while she was on continuous leave,

requesting medical information that she had no right to request. A reasonable jury could find that Defendant retaliated against Banks in violation of the Act.

### a. Defendant's Excuses For Terminating Banks are Pretextual.

The District Court found no *prima facie* case of FMLA retaliation and did not address pretext. However, Banks can show "that a discriminatory reason more likely motivated [Defendant] or indirectly by showing that the [Defendant's] proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Arbitrarily cutting Banks' time to complete the PIP shows pretext. This case is similar to *Martin*, where the defendant school board non-renewed the plaintiff's contract after he took FMLA leave claiming the plaintiff failed to fulfill a PIP. *Martin*, 543 F.3d at 1267. Like Banks, the plaintiff in *Martin* was never provided the full PIP duration to demonstrate improvement prior to his non-renewal. *See id*. This Court held this factual dispute, whether he could have improved through the entirety of the PIP, precluded summary judgment reversing the lower court. *See id*. Here, the PIP document does not state the duration may be cut short and Defendant failed to show any guidance that permitted such a shortening. Instead, Defendant requires a designated duration to be listed on all PIPs pursuant to the only guidance it has: the PIP template. A jury question remains as to whether Banks would have completed the PIP prior to her termination had she been given the time to do so.

The "PIP update" given to Banks on June 9, 2016, was a contrived paper trail manufactured to cover up Defendant's retaliatory motives in deciding to terminate her on June 8, 2016. As such there was no basis to provide her with an "update" of her progress on the PIP. It defies common sense. *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994) ("that the defendant's articulated reasons for its decision are not believable" establishes pretext). This *post-hoc* documentation shows pretext. Plus, the cover up document actually shows improvement.

During the actual termination meeting, Ervin-Harris told Banks that she was fired for failing to complete the PIP. But Banks was not even provided the full five weeks to complete it. This excuse fails on the facts and shows pretext.

In Defendant's motion for summary judgment, it argued that the "PIP and termination, for example, were based on Paul Pomplon's *belief* that Plaintiff's performance was unsatisfactory." Doc. 29-1 at 12-13 (emphasis added). But Pomplon's "beliefs" are not based in fact; the only evidence of Banks's alleged performance deficiencies is Pomplon's self-serving testimony, not objective evidence. At summary judgment, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, *at least to the extent that the evidence comes from disinterested witnesses*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

151 (2000) (emphasis added, cleaned up).[4] No jury will be required to believe Pomplon's "beliefs"—instead the jury can make their own credibility determinations as to his claims. And "[a]lthough courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998). Here, no one did anything to test the veracity of Pomplon's allegations regarding Banks's performance— instead they blindly accepted his criticisms of her work ignoring her protestations to the contrary. But Banks has shown that Pomplon either exaggerated or falsified his claims of her alleged performance deficiencies—and her white coworker who allegedly suffered from the same infirmities as her did not face a PIP and was given a hefty severance payment when terminated. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) (evidence of not having actual poor performance, or disparate treatment of others accused of similar deficits shows pretext).

Plus, Walter admits to trying to dig up dirt on Banks' performance before her transfer to PMO *only one day* after she was "approved" for intermittent breaks. This too shows pretext. *See Giardina v. Lockheed Martin, Corp.*, 2003 WL 21634934,

---

[4] *Reeves* analyzed the standard of granting a Rule 50 motion, an analogous standard to Rule 56. 530 U.S. at 150.

*10 (E.D. La. 2003) (issue of fact where employer tries to "dig up dirt" on the plaintiff).

Finally, Banks performed her job well throughout her tenure as a PM and there were no complaints until Pomplon's arrival. He decided to fire her for trumped up, falsified reasons. The fact is that the last project she worked on was weeks behind schedule and procedurally a mess well before she took over and turned it around— all the while, enduring Pomplon's discriminatory behavior and suffering medical issues requiring leave. This shows that she excelled at her job, not that she was deficient, and a jury could agree.

## B. <u>All of Banks' Leave was Protected Under the FMLA</u>

Pomplon was aware of Banks's serious chronic medical condition on June 1, 2016, as alleged in the Complaint. And, Defendant had documentation regarding the same, ordering medically required breaks by June 3, 2016—five days prior to the termination decision. These facts cannot be parsed out of the analysis. Banks engaged in protected activity by providing the information and the FMLA protects those who even "attempt to exercise" any rights under the Act. 29 C.F.R. § 825.220(a)(1). Of course, she is not required to say "FMLA" in order to invoke the protections of the Act. *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1382-83 (11th Cir. 2005).

The District Court erred by ignoring the June 1, 2016 protected activity, instead only focusing on her continuous leave finding that "Defendant could not have considered Plaintiff's leave when making [the] decision" to terminate her. Doc. 60 at 25. This not only ignores her initial protected activity predating any decision to fire Banks but also ignores that her hypoglycemic episodes that were flaring up beginning June 1, 2016 were the *same* reason for her eventual continuous medical leave. The formal FMLA documentation includes certification of treatment on June 3, 2016 and the final approval designated all leave taken "for this reason" as protected under the FMLA. There were not two separate instances of leave—it was the same health reason that escalated within a week from 30-minute breaks to continuous leave. *See* 29 C.F.R. 825.300(b) (stating "all FMLA absences for the same qualifying reason are considered a single leave").

When the evidence is properly examined wholistically, Pomplon made the decision to fire Banks *only after* he knew about her serious health condition—in fact, only seven days after she reported her condition to him, five days after she submitted medical documentation, and two days after her medically necessary breaks were officially sanctioned.

### C. Theories of Liability Should Not Be Confused With a Plaintiff's *Claim*

"A complaint need not specify in detail the precise theory giving rise to recovery." *Plumbers & Steamfitters Loc. No. 150 Pension Fund v. Vertex Constr.*

*Co.*, 932 F.2d 1443, 1448 (11th Cir. 1991). Theories of liability should not be confused with a plaintiff's *claim*. When courts refer to "theories of liability, as different types of 'claims,' they are using the word 'claim' as a shorthand – and potentially confusing – way of describing how the plaintiff contends that the employer is vicariously liable." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004). Here, the District Court improperly split Banks' protected leave into two phases, intermittent leave versus continuous leave and claimed she did not provide sufficient facts to put the Defendant on notice of her claims. But her claims are not the type of leave she required—her *claims* are for FMLA interference and FMLA retaliation. And both types of leave were for the same serious health condition. The lower court erroneously conflated theories of liability with her claims.

Banks' Complaint properly put Defendant on notice of her FMLA claims and facts supporting the same—including acts that occurred prior to her continuous leave. She suffered from hypoglycemia and both of her supervisors knew of the serious, chronic health condition; discovery revealed this date to be June 1, 2016. *See* Doc. 1 ¶¶ 33-34. She subsequently informed HR of her health condition and was mocked by Ervin-Harris; evidence shows this happened on June 2, 2016. *See id.* ¶ 35. Further, discovery revealed that Banks brought in medical documentation on

June 3, 2016 and email exchanges on June 6, 2016, wherein Ervin-Harris "approved" her 30-minute breaks, copying Pomplon and Walter.

The District Court ignored the fact that Defendant learned of her serious, chronic medical condition and need for time off work *before* deciding to terminate her employment. This is error. These facts were addressed in every deposition taken in this case and Defendant cannot claim prejudice. *See Corbitt v. Walgreen Co.*, No. 7:14-CV-17 (MTT), 2015 U.S. Dist. LEXIS 49186 at *9 (M.D. Ga. Apr. 15, 2015) (noting that plaintiff did not assert new claims only additional facts to support her claims and any objection as to notice was alleviated through discovery and deposition testimony).[5] The District Court also criticized the timing of Banks's amended disclosures, which provide more detail regarding her initial medically required breaks. *See* Doc. 60 at 24. But she amended these prior to the final deposition in this matter, and two weeks prior to Defendant's deadline for filing summary judgment, *to conform to the evidence in discovery*. *See* Docs. 28, 29, 38. Nothing in her Amended Disclosures prejudiced Defendant. Indeed, how could the Defendant be surprised by facts it already knew? That Defendant stuck its head in the sand should not be to Banks' detriment.

---

[5] *See, e.g.*, Docs. 33-10; 33-13; 33-15; 33-39; Doc. 34 at 80:16-24, 83:16-84:2, 88:4-19, 92:6-13, 164:12-20, 165:6-24; Doc. 35 at 109:9-20, 111:18-21; Doc. 36 at 50:16-51:1, 77:2-4, 78:11-12; Doc. 37 at 106:3-14, 106:20-107:15; Doc. 38 at 57:9-12, 70:3, 70:16-21, 74:14-18, 75:18-22.

Banks met her pleading requirements, which do not even mandate a *prima facie* case, which "is an evidentiary burden, not a pleading requirement." *Swiekiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002). In discovery the parties seek evidence to support, clarify and amplify the claims noticed in the Complaint. Contrary to the lower court's determination, Banks did not add new "claims" to her lawsuit in arguing against Defendant's summary judgment motion, she simply elaborated the factual underpinnings of her claims that Defendant violated the FMLA by both interfering with her rights and retaliating against her. The District Court erroneously conflated Banks' FMLA claims with theories of liability and in doing so held her to a higher pleading standard than required by the rules and precedent.

The District Court's Order should be reversed and a jury should decide Banks' two FMLA claims.

## II. BANKS SUFFERED TRIAL BY AMBUSH AND THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING HER MOTION FOR A NEW TRIAL

Plaintiff sought a new trial on her race discrimination claims because she was denied a fair one. Going into trial, Defendant claimed it did not discriminate against Banks and she was fired for poor performance. The only witness who alleged she failed to perform well and was identified at any point prior to trial was her new supervisor, Paul Pomplon; Banks disputed his false characterizations of her. At trial,

Defendant ambushed Plaintiff with hearsay testimony that others allegedly complained of Banks' performance as well—allegations never claimed prior to trial. Defendant further engaged in ambush tactics by back-dooring a defense never pled, introducing impermissible character evidence, and violating the trial court's Pretrial Order prohibiting testimony regarding legal advice. Defendant's ambush tactics surprised and prejudiced Plaintiff and caused her to suffer an unfair trial.

The trial court denied Banks' Motion for a New Trial disclaiming any error in its evidentiary rulings, finding no fault in Defendant springing new "witnesses," allegations, and defenses at trial that it never disclosed before trial. The lower court also took the challenged actions in piecemeal fashion instead of examining the claimed errors wholistically. The trial court abused its discretion, the Order should be reversed, and Banks awarded a new trial because justice so requires.

A. **Standard For Granting a New Trial**

Pursuant to Rule 59, Courts may "on motion, grant a new trial on all or some of the issues" for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Courts have discretion to order a new trial as to any issue "on its own…for any reason that would justify granting one on a party's motion." Fed. R. Civ. P. 59(d). "The plenary power granted a district court under Rule 59(a) does not conflict with or usurp the province of the jury. Rather, it 'gives the trial judge ample power to prevent what he considers to be

a miscarriage of justice. It is the judge's right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so.'" *Henley v. FMC Corp.*, 189 F.R.D. 340, 349 (S.D. W. Va. 1999), quoting Charles A. Wright *et al.*, <u>Federal Practice and Procedure</u> § 2803 (2d ed. 1995).

New trials have been ordered in federal court where parties have been subject to trial by ambush and Banks seeks the same. For example, in *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978), this Court granted a new trial after finding the defendant was the victim of "trial by ambush." There the plaintiff brought a products liability claim after he suffered an injury when the step on his truck broke; he failed to timely disclose that he had a heart attack that he attributed to the product defect contrary to the rules of civil procedure. In fact, he did not make the disclosure until the eve of trial. The jury ruled in the plaintiff's favor but on appeal, this Court noted that in regard to the untimely disclosure:

> Plaintiff's disregard for the federal rules of discovery in this area created a 'trial by ambush' which those rules are designed to prevent. The rules are designed to narrow and clarify the issues and to give the parties mutual knowledge of all relevant facts, thereby preventing surprise.

*Id*. at 1159. The Court further noted that, "it may well be possible in many cases for able counsel on an overnight basis to prepare and defend against last-minute claims by his adversary [but that] could degenerate into 'quick-draw hip-shooting' [which] is precisely what the discovery rules were designed to prevent." *Id*. Finding that the

defendant was subject to undue surprise and presented a much different case at trial than revealed in discovery, this Court ordered a new trial on damages to serve "the interests of justice." *Id*. at 1159-60.

In *Erskine v. Consol. Rail Corp.*, 814 F.2d 266 (6th Cir. 1987), the Sixth Circuit also ordered a new trial where a party failed to provide relevant, critical evidence during discovery and ambushed the plaintiff at trial. There, the plaintiff claimed injury due to the negligence of his employer in failing to maintain its equipment; however, at trial, the defendant claimed it did an investigation that showed the plaintiff only suffered injuries due to his own negligence. The defendant failed to produce the investigative report during discovery and the plaintiff was ambushed with it at trial as well as with other maintenance records. *Id*. at 272-73. The court found that "[t]he aggregate of defendant's conduct throughout the course of pretrial proceedings resulted in precisely the sort of 'trial by ambush' that the Federal Rules were designed to prevent." *Id*. at 273. The court also concluded the defendant's actions in failing to disclose the evidence "clearly deprived plaintiff of the opportunity to develop the facts necessary to support his case" and springing this evidence at trial caused the plaintiff prejudice and ordered a new trial. *Id*. at 273.

In *Greyhound Lines, Inc. v. Miller*, 402 F.2d 134, 144 (8th Cir. 1968), the court also ordered a new trial after the defendant was ambushed when the plaintiff failed to provide relevant medical records contrary to the rules of civil procedure.

*See id*. The court stated, "[w]e think neither the letter nor the spirit of the federal disclosure rules was satisfied" and that the plaintiff's "[f]ailure to [produce the records] so prejudiced the defendant and warrants a new trial." *Id*.

Like the offending parties in *Shelak, Erskine, and Greyhound Lines*, Defendant failed to abide by the rules of procedure and discovery and ambushed Plaintiff at trial with alleged new witnesses, facts, and defenses. Defendant's tactics are the antithesis to the rules and should be punished, not rewarded. Plaintiff should be given a new trial because her rights were substantially affected.

### B. <u>Trial By Ambush is *Supposed* to Be a Thing of the Past</u>

"Prior to the enactment of the Federal Rules of Civil Procedure in 1938, the parties had no effective means of discovering information and narrowing the issues; in fact, litigants were generally protected against disclosing the facts of their cases. [T]rial by ambush and secrecy was considered normal in the courts of law. No discovery tools were available to ferret out information about an opponent's claim or defense." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986) (cleaned up). "That day is said to have ended." *Shelak*, 581 F.2d at 1160.

"One of the primary objectives of the discovery provisions embodied by the Federal Rules of Civil Procedure is elimination of surprise in civil trials." *Erskine*, 814 F.2d at 272; *see also*, *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980) ("rules, of course, were designed to make pretrial and discovery uniform

across the country and to prevent 'trial by ambush'"). Discovery "helps to facilitate the orderly resolution of cases by encouraging parties to 'show their hands' while at the same time prohibiting parties from 'hiding the ball' as though litigation is nothing but a game of 'gotcha.'" *Mason v. George*, No. 1:12-CV-159 (WLS), 2013 U.S. Dist. LEXIS 148471, at *3-4 (M.D. Ga. Oct. 16, 2013).

In other words, "litigation under the Federal Rules of Civil Procedure is not supposed to be merely a game, a joust, a contest; it is also a quest for truth and justice." *Ash v. Wallenmeyer*, 879 F.2d 272, 275 (7th Cir. 1989). But Defendant failed to abide by these rules and ambushed Plaintiff at trial.

### C. Defendant Ambushed Banks at Trial with Hearsay Testimony

Prior to trial, the only alleged evidence that Banks performed poorly in her job came from Pomplon and no other witnesses were identified as having issues with Banks' performance. Walter and Ervin-Harris acknowledged in their depositions that they had no first-hand knowledge of Banks' performance and relied solely on Pomplon's (false) representations. And prior to trial, Defendant provided zero evidence and identified no other witnesses of any other person who allegedly had issues with Banks' performance other than Pomplon through updated disclosures, its required outline of the case filed with the Pretrial Order, or its trial brief. Doc 67 at 6, ¶ 15; Doc. 67-7; Doc. 118.

At trial, Banks meticulously showed the jury how all the allegations in the PIP

were false or manipulations of the truth through her testimony and objective documentation. Left with no defense to Plaintiff's obliteration of its excuse for her termination, Defendant reached for alleged hearsay statements from witnesses who were never disclosed in this litigation prior to trial that they, too, had complaints about Banks' performance: Ted Grulikowski, Melissa Lopez, Bill Weaver, and amorphous SBI employees. The trial court erred in permitting the hearsay testimony which, cumulatively, substantially prejudiced Banks' right to have a fair trial.

### 1. *Defendant's Hearsay Testimony Regarding Grulikowski Should Have Been Excluded*

Most damning to Banks was the hearsay testimony that Grulikowski, a VP for Defendant, allegedly said he would never work with the PMO as long as Banks worked there. Permitting this scandalous hearsay statement over Plaintiff's objections was error. Defendant failed to disclose Grulikowski prior to trial and contrary to the lower court's ruling, Plaintiff never invited the hearsay testimony.

The first time Grulikowski's name ever left any of Defendant's witnesses' lips was at trial. Defendant never disclosed Grulikowski as a potential witness with discoverable information in this case in its Rule 26 disclosures or any pretrial filing. Plaintiff pointed this out in regard to Walter's testimony and yet the court permitted the hearsay. Doc. 167 at 71:25-72:5. She raised these issues once again when Defendant solicited the same information from Pomplon—inappropriately referencing Walter's testimony from the day before. Doc. 168 at 75:19-25, 76:2-13,

77:7-14. But after a lengthy sidebar, the court overruled her objections erroneously adopting the Defendant's argument that it was not required to disclose his identity. Doc. 168 at 79:5-80:20. Pomplon eventually testified that he was only aware of others' complaints (also never disclosed), not Grulikowski's, but the damage was done through Defense counsel's questioning.

The trial court's ruling was in error. Defendant ambushed Plaintiff at trial with information never disclosed knowing that she would have no way to combat the surprise information. If Defendant had not flaunted adherence to the rules, she would have deposed Grulikowski and been prepared to rebut such testimony. Doc. 168 at 80:7-9. This alleged statement by Grulikowski was so unfairly prejudicial to Plaintiff as to question the outcome of the verdict. After hearing the Grulikowski hearsay, the jury certainly could have thought that Pomplon was right, she was a bad employee, and Grulikowski's refusal to work with the department was reason alone to fire her.

Discovery calls for full disclosure. Hiding the ball and attempting to play "gotcha" litigation is not permitted under the broad rules of discovery in federal court. Rather, each party is *required* to disclose the names of individuals "likely to have discoverable information" that it "*may* use to support its [ ] defenses." Fed. R. Civ. P. 26(a)(1)(A) (emphasis added). And parties are required to timely supplement these disclosures. Fed. R. Civ. P. 26(e)(1). If a party fails to disclose a witness, it should be precluded from utilizing that witness' testimony unless the failure to

disclose is substantially justified. Fed. R. Civ. P. 37(c)(1). Here, there can be no justification for failing to disclose Grulikowski's identity and alleged knowledge in this matter. Even if Defendant learned this information after the close of discovery, it had literally *years* to come forward with the information before the beginning of trial—discovery ended on March 26, 2019, and trial did not begin until February 14, 2022. But it did not. This shows bad faith.

While it is true that Defendant did not literally call Grulikowski as a witness at trial, he appeared as a witness *in absentia* through hearsay testimony of his alleged comments which were transparently meant to bolster Pomplon's false complaints of Banks' performance. But when a party fails to comply with their Rule 26 obligations, the proper sanction is to prohibit—not permit—usage of that information at trial. *See e.g., Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230-31 (7th Cir. 1996) (holding sanction of exclusion mandatory for non-disclosure unless justified or harmless); *Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 770 (11th Cir. 2008) (striking affidavit of witness when party failed to disclose the same pursuant to Rule 26).

Plus, if Defendant had identified this alleged defense in the required pretrial filings, Plaintiff could have addressed the issue with the Court prior to trial, moving *in limine* to exclude the information, or postponing trial to conduct discovery regarding the new information. But Defendant withheld the information to ambush

Plaintiff at trial causing her to suffer surprise, prejudice, and an unfair trial. The error in permitting this hearsay was not harmless.

Further, the lower court erred in finding that Plaintiff solicited the Grulikowski hearsay in her question to Walter. Doc. 167 at 70:19-72:7. This is simply not true. Walter was asked a "yes or no" question and purposefully spat out the Grulikowski allegation. *Id*. at 63:16-24. Based on the information known to Plaintiff prior to trial, Walter's answer should have been "no." This is sandbagging and Plaintiff pointed out to the Court that Walter volunteered the information. *Id*. at 71:7-11. Plaintiff did not "invite" the error and the trial court's ruling permitting Walter's hearsay testimony was an abuse of discretion.

The trial court maintains that its ruling regarding Walter's testimony was proper: that disclosure of Grulikowski was not required because he did not testify; Plaintiff solicited the testimony; and Walter made the statement when called in Plaintiff's case in chief. Doc. 185 at 13-19. Plaintiff disputed the first two issues above, but as far as calling him in her case in chief, he was called as a hostile witness. The trial court abused its discretion in permitting this never before disclosed testimony.

### 2. *Defendant Falsely Claimed that Lopez Complained About Banks' Performance*

Unlike Grulikowski, Defendant did disclose Melissa Lopez in its Rule 26 Disclosures, stating she "*may* have knowledge regarding Plaintiff's job

performance." Doc. 11 at 6 (emphasis added). However, there was no evidence prior to trial—either from deposed witnesses, document production, or pretrial filings—that she had any complaints about Banks' job performance. Yet, at trial, Pomplon testified that Lopez complained about Banks' job performance with regards to the organization of the SBI project when he first arrived, in other words, before Banks was ever even assigned to the project—then defense counsel reframed it as a definitive complaint about Banks' performance. Doc. 168 at 82:14-83:12, 87:3-8. But this is not true; Lopez did not have complaints about Banks, this was a complete fabrication. Doc. 160-1, ¶ 7. However, she had many complaints about SBI, which she repeatedly brought to Walter's attention. *Id*. at ¶¶ 8-10. Once again, if Defendant had complied with pretrial filing requirements, Plaintiff would have been prepared to combat this lie at trial with Lopez present to testify. But due to Defendant's gamesmanship, Plaintiff was surprised at trial with the false allegation meant to bolster Pomplon's singular complaints about Banks' performance.

The trial court states that Lopez's declaration does not show a new trial is warranted because "[d]isputes among witnesses are for the jury to assess." Doc. 185 at 26. This misses the point. Had the Defendant disclosed this allegation prior to trial, then Lopez would have testified, and the jury could have resolved the factual dispute. But, because of Defendant's sandbagging, she was not there and they were permitted to present hearsay testimony that once again gave the jury the impression

that numerous individuals complained about Banks—not just Pomplon. Of course, going into trial, the whole defense was that the "PIP and termination, for example, were based on Paul Pomplon's *belief* that Plaintiff's performance was unsatisfactory." Doc. 29-1 at 12-13 (emphasis added). No one else, just Pomplon.

### 3. *Hearsay Testimony Permitted to Purportedly Show the Effect on the Listener Was in Error*

The trial court erred in admitting hearsay testimony based on the "effect of the listener" when none of these witnesses testified as to taking any particular action based on the alleged comments. Harris was permitted to testify that Banks' former supervisor, presumably Weaver, said Banks made "a lot of mistakes." Doc. 167 at 98:21-23. Plaintiff timely objected and the Court overruled stating it "was going to Ms. Ervin-Harris' knowledge and state of mind and reasons for her actions, it's not hearsay. In other words, an exception to hearsay." Doc. 167 at 99:2-17. This was not a "state of mind" exception that goes to the state of the declarant, but the effect on the listener. *See T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 827-28 (11th Cir. 1991) (explaining the state of mind exception under Rule 803(3) goes to the declarant, not the listener). But importantly, the *non-decisionmaker* Harris never testified as to how this alleged information impacted any

actions she took.[6] In other words, she simply said it for the alleged "truth of the matter" and it should have been excluded. *See Williams v. Illinois*, 567 U.S. 50, 108 n.3 (2012) (noting hearsay that was unrelated to alleged search were "introduced for their truth").

Pomplon was permitted to testify that SBI employees also had complaints about Banks' performance—the "same feedback that Melissa [Lopez] gave [him]" over Plaintiff's hearsay objection. Doc. 168 at 84:10-85:8. Once again, the trial court determined that it was "not hearsay if it goes to Mr. Pomplon's state of mind and the information he had, and the reasons for his conduct and actions." *Id*. at 84:23-85:2. But once again, Pomplon never testified as to how this alleged information impacted his conduct or any actions that he took, showing the statements were introduced solely for their alleged truth, not effect on the listener.

Permitting these hearsay statements over Plaintiff's objections based on the "effect of the listener" was in error. No effects were ever described because these statements were either false or played no part in Pomplon's decisions—or both. It was error to permit Defendant to introduce hearsay testimony going to the heart of the issue in this case: Plaintiff's performance. Defendant sandbagged Plaintiff with this testimony in its attempt to sway the jury by bolstering Pomplon's false

---

[6] Plaintiff ultimately impeached her, showing that she fabricated the allegation; however, the information was stuck in the jurors' minds by that point. Doc. 168 at 26:3-16.

accusations and causing Banks to have an unfair trial.

The trial court states its ruling regarding the effect on the listener for Pomplon "was a correct ruling." Doc. 185 at 28. Respectfully, it was not. On top of never disclosing these hearsay allegations prior to trial, Pomplon never testified how it affected him or his decision to fire Banks. As for Ervin-Harris, the trial court also maintains its ruling was proper because she was "the HR person involved" with the termination. *Id*. at 54. While she may have handled the exit paperwork, she was *not* a decisionmaker. This, too, was error. The trial court abused its discretion.

### 4. *Defendant Backdoored An Affirmative Defense It Never Asserted In Its Answer To Plaintiff's Complaint*

When Plaintiff challenged Walter regarding his hearsay statement of Grulikowski, he mumbled, that maybe Grulikowski said it *after* Defendant fired Banks. Doc. 167 at 213-77:4. Well, if that were true, this bogus statement would constitute after acquired evidence, an affirmative defense that Defendant did not plead or prove. Having failed to plead it, Plaintiff was denied the opportunity to conduct discovery regarding this defense. And importantly, after acquired evidence *does not foreclose liability* and only serves to cut off damages. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359-60 (1995). If Plaintiff had known this defense was in play, she would have addressed it before trial to ensure that the jury suffered no confusion regarding after acquired evidence—but it was portrayed as evidence supporting her termination, not learned after the firing. This too

ambushed Plaintiff.

The trial court found its rulings proper stating the alleged Grulikowski comments "would have been relevant to Walter's decision-making role in approving and not vetoing Plaintiff's termination." Doc. 185 at 20. But Walter never said that— he only said that he heard the comment—he never said it had any impact on him personally or that he considered it in not vetoing Banks' termination. As for Walter's backtracking, the trial court stated it could not have anticipated that later testimony, but that it was up to the jury to determine whether he changed his testimony. Doc. 185 at 21-22. And the trial court states that "any issue of 'after-acquired evidence' would be moot in light of the jury verdict." Doc. 185 at 24. But this misses the point—there is a vast difference between alleged evidence supporting an adverse employment decision versus alleged evidence discovered later. The former can stave off liability, the latter can only serve to cut off damages. The trial court further found Walter's testimony did not rise to the level of an affirmative defense and that Plaintiff made no contemporaneous objection on this ground, so the argument was waived. Doc. 185 at 22. But Plaintiff's objections can still be reviewed under a standard of "plain error." *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993). The trial court abused its discretion in permitting this never before disclosed testimony.

### 5. Defendant's Closing Argument Shows Its Intent to Use Hearsay Evidence For the Truth of the Matter Asserted

Defendant's closing argument shows it intended to sandbag Plaintiff with these hearsay statements as substantive evidence, for the "truth" of the matter asserted, and not for any effect on the listener. Defendant's counsel argued, "So what else reflects performance?" before referring to the hearsay statements of Grulikowski, Lopez and the SBI employees as evidence of poor performance. Doc. 169 at 16:15-17:8. Not that it was hearsay that somehow influenced Pomplon (or non-decisionmakers Walter and Harris)—but *actual evidence* that Banks was allegedly a poor performer to bolster Pomplon's allegations that were wholly uncorroborated before trial. This argument prejudiced Plaintiff. *Cameron v. City of N.Y.*, 598 F.3d 50, 65-66 (2d Cir. 2010) (noting that use of "erroneously admitted testimony" in closing argument not harmless and ordering a new trial). The voluntary and solicited hearsay statements were not by accident and the admission of these statements unduly prejudiced Banks causing her to suffer an unfair trial.

The trial court claims that Plaintiff did not preserve this objection at trial. Doc. 185 at 58, n.10. This misses the point—the fact is that the closing argument shows what Defendant solicited the numerous hearsay statements for. Not for the effect on the listener, but for substantive evidence that Banks' performance was lacking. The trial court abused its discretion in failing to take this into consideration when examining the totality of the hearsay.

### *6. Plaintiff Suffered Incurable Prejudice Due to the Hearsay Statements*

As repeatedly noted, there was zero disclosure of any of these alleged hearsay complaints of Banks' performance prior to trial. Defendant introduced an entirely new defense: Pomplon was not the only person who thought Banks' performance was inadequate—there was now a Vice President (!) who refused to even work with her department while she was employed—as well as complaints from the marketing director, SBI employees, *and* her former supervisor. Defendant got this hearsay testimony before the jury not through one witness, but through three witnesses.

Plaintiff should be granted a new trial as to the Grulikowski hearsay alone. *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 112 (5th Cir. 1982) (finding the trial court did not err in granting a new trial where the plaintiff introduced new witness never identified prior to trial and injected new theories in the case). But Defendant piled on with the false hearsay statements of Lopez, Weaver and SBI employees. Certainly the cumulative nature of this unfounded hearsay testimony prejudiced Banks requiring a new trial. *United States v. Hands*, 184 F.3d 1322, 1334-35 (11th Cir. 1999) (ordering a new trial based on the cumulative effect of errors that "add up to a conclusion that the improper admission of evidence was not harmless error").

The trial court claims that the Grulikowski hearsay only had "marginal impact" that was alleviated through cross-examination. Doc. 185 at 24-25. This is

simply not true—this hearsay alone told the jury that Pomplon's "beliefs" were reinforced and supported by a vice president of the company. It is incredulous for the trial court to say with certainty that this hearsay only had "marginal impact" on Banks' case.

The trial court further states that the Lopez and SBI hearsay testimony "was a relatively small portion of Pomplon's testimony, [and] did not have a substantial impact on the outcome of the trial." Doc. 185 at 28, n.5. This cannot be said with any certitude. The cumulative nature of bolstering Pomplon's "beliefs" were meant to validate his unsubstantiated criticisms of Banks' work—there is no way anyone can say with certainty that the verdict would not have been different if the jury only heard the evidence disclosed prior to trial: that only Pomplon had problems with Banks' work product. And "[i]f one cannot say, with fair assurance, … that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Aetna Casualty & Surety Co.,* 803 F.2d at 1159 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765 (1946)).

Indeed, the Order does not examine Plaintiff's arguments for a new trial holistically but parses it into distinct claims of error. But Plaintiff's argument is that, while the Grulikowski hearsay alone warrants a new trial, the totality of these never before presented claims certainly warrant a new trial. The trial court abused its discretion.

### D. **Defendant Should Not Have Been Permitted to Introduce Impermissible Character Evidence**

Over Plaintiff's objections, the trial court permitted Defendant to introduce alleged evidence that Pomplon hired Brandon Burrows (black man) for the PMO over nine months after he fired Banks as well as hired Srividya Subramanian (Indian woman) almost a year after terminating Banks. The court also permitted Pomplon to provide self-serving character testimony. But Rule 404(a)(1) prohibits the admission of such character evidence.

#### 1. *Admission of Subsequent Hiring Decisions Was Error*

Plaintiff timely objected to the introduction of testimony regarding the hiring of Burrows or Subramanian as violating Rule 404, as well as the fact that it was not raised prior to trial, resulting in a lengthy side bar. Doc. 168 at 172:2-181:15. Almost immediately, the trial court reprimanded Plaintiff's timing of arguing against this yet-to-be introduced evidence accusing Plaintiff's counsel of "sandbagging" the Court, the jury, and even opposing counsel with her objections because the Defendant brought up the hirings in its opening statement. Doc. 168 at 173:1-174:7. But if Defendant had disclosed this defense at any time prior to trial—as required— this issue would have been the subject of pretrial motions. The only sandbagging was by the Defendant. However, the court erroneously overruled Plaintiff's objections. Doc. 168 at 181:14-15.

The admission of the alleged hiring of Burrows (for which no objective evidence has *ever* been produced, *see, e.g.*, Doc. 33-24 at 4) was in error because it was too remote and tentative to have any connection to Defendant's firing of Banks. Burrows did not allegedly become a project manager until 2017, after D'Elena's firing, and only worked in a junior position prior to that time. Doc. 36 at 126:3-18; Doc. 168 at 177:13-20. In fact, Defendant testified that Subramanian replaced Banks, though she too, started after D'Elena's termination and almost a year after it fired Banks. Doc. 36 at 125:3-20; Doc. 33-24 at 4; Doc. 168 at 177:21-23.

The timing for each hiring was too remote to be relevant to the issue before the jury: whether Banks was fired because she is black. This is true especially because it post-dated Banks' Charge of Discrimination by nine months and also post-dated Defendant's response to her Charge, filed on October 6, 2016. "Subsequent hiring or promotion practices are clearly not relevant to the question of whether discrimination occurred prior to the commencement of a Title VII action." *Gonzales v. Police Dept., City of San Jose, Cal.,* 901 F.2d 758, 762 (9th Cir. 1990). Such evidence "can be highly misleading." *Id*. at 761. And the decision to hire him – and her – was likely a manipulative move just to combat Banks' claims of race discrimination, further showing the irrelevance of the information. *See id*. at 762 (collecting cases). "Such actions in the face of litigation are equivocal in purpose, motive and permanence." *Gamble v. Birmingham S. R. Co.*, 514 F.2d 678, 683 (5th

Cir. 1975), quoting *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1376-77 n. 36 (5th Cir. 1974) (noting that the hiring of four black employees prior to trial "does not constitute a defense to plaintiffs' charges, nor does it moot the issues"). The refusal to admit evidence of "foxhole Christianity" is nothing new as shown by the cites above. It was error to admit this evidence over Plaintiff's objections.

Even if there were some possible argument that this evidence was admissible *and* relevant, it should have been excluded under Rule 403 as that Rule's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Sawyer*, 799 F.2d 1494, 1506 (11th Cir.1986), quoting *United States v. Thevis*, 665 F.2d 616, 633-34 (5th Cir. 1982). This evidence, combined with other evidence that should have been prohibited during trial, heaped on the pile of unfairness against Plaintiff and further supports a new trial.

The trial court states its ruling at trial "was correct and no new trial is warranted" and characterizes Burrows hiring as in "short proximity" to Banks' firing. Doc. 185 at 31, 32 n.6. But nine months is not a short time frame—especially when intervening acts of a Charge of Discrimination and response by the company occurs prior to his hiring. As to this point, the trial court states *Gonzales*' ruling was based on an intervening lawsuit, not a Charge, and that this makes a difference. *Id*. at 34-35. Why? Both may lead to liability for discriminatory acts. Finally, the trial

court states that Plaintiff cannot complain about this evidence when she submitted evidence of Pomplon's "racial biases." *Id*. at 38. This fails to acknowledge that Burrows' hiring has no relevance to Banks' firing.

As for Subramanian, the trial court claimed that Banks' waived this argument by not including the same in her initial Motion for a New Trial. Doc. 185 at 39-40. This takes a narrow view of the Rule; the committee notes state that the motion "does not require ritualistic detail but rather a fair indication to court and counsel of the substance of the grounds relied on." Fed. R. Civ. P. 59, advisory committee's note to 1966 amendment. Plaintiff provided fair notice in her initial motion.

### 2. *Admission of Pomplon's Self-Serving Character Evidence Was Error*

Defendant further solicited a lengthy colloquy by Pomplon regarding his "character" – where he literally said allegations against him were "out of character" and that "it's not in my character." Doc. 167 at 36:6-39:4. When Plaintiff objected, the court overruled the objection. *Id*. at 39:5-11. This ruling was in error because the testimony violated Rule 404(a)(1) and further prejudiced Plaintiff.

The trial court again states this was not in the initial motion and untimely, but the testimony "was of absolutely no materiality at trial." Doc. 185 at 41-42. But permitting the supervisor responsible for Banks' firing to testify about his own character at length was error. The trial court abused its discretion.

### E. **Defendant Violated the Pretrial Order Prohibiting Testimony that It Relied on Legal Advice in Terminating Banks**

In flagrant violation of a pretrial Order, Pomplon testified that he consulted the company's in-house attorney in making the decision to fire Banks. Docs. 76, 87, 168 at 156:15-22. Plaintiff promptly objected to the violation; Defendant's counsel claimed Pomplon was instructed to not "talk about what the lawyers did." Doc. 168 at 156:25-157:23. This makes Pomplon's violation intentional—he was warned that a court order prohibited stating lawyers were involved in the discussion to terminate Banks. The trial court instructed the jury to disregard the previous question and answer but the damage was done. *Id*. at 165:15-20. Violating the order also ambushed Plaintiff and caused her undue prejudice.

The trial court found that its ruling on this objection, and ensuing instructions were proper and Plaintiff's argument is "meritless." Doc. 185 at 28-30. Respectfully, the trial court underestimates the impact of a jury hearing that a lawyer blessed a firing. And while a curative instruction was given, the genie was out of the bottle.

## CONCLUSION

For the reasons herein, the District Court's Orders should be reversed and this matter remanded for a jury trial on the merits regarding all of Ms. Banks' FMLA and race discrimination claims.

Respectfully submitted,

  /s/ Lisa C. Lambert
Lisa C. Lambert
Georgia Bar No. 142135
Law Office of Lisa C. Lambert
245 N. Highland Avenue
Suite 230-139
Atlanta, Georgia 30307
404.556.8759
lisa@civil-rights.attorney

  /s/ Cheryl B. Legare
Cheryl B. Legare
Georgia Bar No. 038553
LEGARE, ATTWOOD & WOLFE, LLC
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone:  470-823-4000
Facsimile:  470-201-1212
cblegare@law-llc.com

Attorneys for Plaintiff/Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, it contains 12,991 words in the Brief.

  /s/ Lisa C. Lambert
Lisa C. Lambert

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

sent via CMF to the attorneys identified below this 22d day of September 2023:

William E. Corum
william.corum@huschblackwell.com
Christopher Garrett Moorman
cgm@moormanpieschel.com
Moorman Pieschel, LLC
One Midtown Plaza, Ste. 1205
1360 Peachtree Street, NE Atlanta, Ga 30309


  /s/ Lisa C. Lambert
Lisa C. Lambert